## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| LAURA KRISTEN TREADWAY, | CASE NO. 3:14-cv-01697-GBC |
| Plaintiff, | (MAGISTRATE JUDGE COHN) |
| v. | MEMORANDUM |
| CAROLYN W. COLVIN,<br>ACTING COMMISSIONER OF<br>SOCIAL SECURITY, | |
| Defendant. | Docs. 1, 5, 6, 10, 11 |

## MEMORANDUM

### I.    Introduction

The above-captioned action is one seeking review of a decision of the Commissioner of Social Security ("Commissioner") denying the application of Plaintiff Laura Kristen Treadway ("Plaintiff") for supplemental security income ("SSI") and disability insurance benefits ("DIB") under the Social Security Act, 42 U.S.C. §§401-433, 1382-1383 (the "Act"). Here, a state agency consulting psychologist examined Plaintiff and opined that she had disabling cognitive and psychiatric limitations. This opinion corroborates Plaintiff's treating psychiatrist, who also opined that she had disabling cognitive and psychiatric limitations. These physicians identified symptoms related to mood disorders, anxiety, psychosis, hallucinations, memory, concentration, and novel situations.

The ALJ failed to acknowledge the consultative examining opinion. The

ALJ rejected the treating opinion in favor of an opinion by a non-examining, non-treating physician who erroneously characterized the record as containing no other medical opinions; showing normal attention, memory, concentration, and functioning in novel situations; and that Plaintiff's hallucinations were controlled by treatment. This precludes meaningful judicial review. For the foregoing reasons, the Court will grant Plaintiff's appeal, vacate the decision of the Commissioner, and remand for further proceedings.

## II. Procedural Background

On May 4, 2011, Plaintiff filed an application for DIB and SSI under the Social Security Act, 42 U.S.C. §§401-433, 1382-1383 (the "Act"). (Tr. 197-207). On July 15, 2011, the Bureau of Disability Determination denied these applications (Tr. 112-31), and Plaintiff filed a request for a hearing on September 17, 2011. (Tr. 143-44). On January 15, 2013, an ALJ held a hearing at which Plaintiff and a vocational expert ("VE") appeared and testified. (Tr. 57-108). On January 25, 2013, the ALJ found that Plaintiff was not disabled and not entitled to benefits. (Tr. 40-56). On February 15, 2013, Plaintiff filed a request for review with the Appeals Council (Tr. 37-39), which the Appeals Council denied on July 2, 2014, thereby affirming the decision of the ALJ as the "final decision" of the Commissioner. (Tr. 1-7).

On August 29, 2014, Plaintiff filed the above-captioned action pursuant to

42 U.S.C. § 405(g) to appeal the decision of the Commissioner. (Doc. 1). On November 24, 2014, the Commissioner filed an answer and administrative transcript of proceedings. (Docs. 5, 6). On February 9, 2015, Plaintiff filed a brief in support of her appeal ("Pl. Brief"). (Doc. 10). On March 13, 2015, Defendant filed a brief in response ("Def. Brief"). (Doc. 11). On September 30, 2015, the parties consented to transfer of this case to the undersigned for adjudication. (Doc. 15). The matter is now ripe for review.

## II.    Standard of Review

When reviewing the denial of disability benefits, the Court must determine whether substantial evidence supports the denial. *Johnson v. Comm'r of Soc. Sec.*, 529 F.3d 198, 200 (3d Cir. 2008); *Brown v. Bowen*, 845 F.2d 1211, 1213 (3d Cir. 1988). Substantial evidence is a deferential standard of review. *See Jones v. Barnhart*, 364 F.3d 501, 503 (3d Cir. 2004). Substantial evidence "does not mean a large or considerable amount of evidence, but rather 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Pierce v. Underwood*, 487 U.S. 552, 565 (1988) (quoting *Consol. Edison Co. of New York v. N.L.R.B.*, 305 U.S. 197, 229 (1938)). In other words, substantial evidence requires "more than a mere scintilla" but is "less than a preponderance." *Jesurum v. Sec'y of U.S. Dep't of Health & Human Servs.*, 48 F.3d 114, 117 (3d Cir. 1995) (citing *Richardson v. Perales*, 402 U.S. 389, 401 (1971)).

### III. Sequential Evaluation Process

To receive disability or supplemental security benefits, a claimant must demonstrate an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); 42 U.S.C. § 1382c(a)(3)(A). The Act requires that a claimant for disability benefits show that he has a physical or mental impairment of such a severity that:

> He is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

42 U.S.C. § 423(d)(2)(A); 42 U.S.C. § 1382c(a)(3)(B).

The Commissioner uses a five-step evaluation process to determine if a person is eligible for disability benefits. *See* 20 C.F.R. § 404.1520; *see also Plummer v. Apfel*, 186 F.3d 422, 428 (3d Cir. 1999). If the Commissioner finds that a Plaintiff is disabled or not disabled at any point in the sequence, review does not proceed. *See* 20 C.F.R. § 404.1520. The Commissioner must sequentially determine: (1) whether the claimant is engaged in substantial gainful activity; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals a listed impairment from 20 C.F.R. Part 404, Subpart

P, Appendix 1 ("Listing"); (4) whether the claimant's impairment prevents the claimant from doing past relevant work; and (5) whether the claimant's impairment prevents the claimant from doing any other work. *See* 20 C.F.R. §§ 404.1520, 416.920. Before moving on to step four in this process, the ALJ must also determine Plaintiff's residual functional capacity ("RFC"). 20 C.F.R. §§ 404.1520(e), 416.920(e).

The disability determination involves shifting burdens of proof. The claimant bears the burden of proof at steps one through four. If the claimant satisfies this burden, then the Commissioner must show at step five that jobs exist in the national economy that a person with the claimant's abilities, age, education, and work experience can perform. *Mason v. Shalala*, 994 F.2d 1058, 1064 (3d Cir. 1993). The ultimate burden of proving disability within the meaning of the Act lies with the claimant. *See* 42 U.S.C. § 423(d)(5)(A); 20 C.F.R. § 416.912(a).

## IV. Relevant Facts in the Record

Plaintiff was born on December 31, 1982 and was classified by the Regulations as a younger individual through the date of the ALJ decision. (Tr. 51). 20 C.F.R. § 404.1563. Plaintiff has at least a high school education and has past relevant work as a cashier, fast food worker and store laborer. (Tr. 51).

Plaintiff graduated from high school in 2001 after receiving special education services from the first grade onward. (Tr. 70, 246, 378). In May of 2006,

psychiatric evaluation indicated that she was twenty-three years old with three children, had a history of sporadic employment, and was a "stay at home mom" with no income. (Tr. 340). She had "severe depression and anxiety." (Tr. 340). She reported racing thoughts, crying spells, and memory loss. (Tr. 340). She indicated that pervious employment had ended "due to issues regarding her family or conflicts with others." (Tr. 340).

She worked as a retail cashier for one month in September and October of 2006 and for three months from April to June of 2007. (Tr. 261-68). She completed only four months of an eight-month medical assistant's program in 2007 due to what she described as a "deep depression." (Tr. 71). She worked three hours a day as a transportation aide on a school bus from January to December 2008. (Tr. 261-68). In October of 2008, she was living at Harrisburg YWCA. (Tr. 340). She had been referred to a psychiatric evaluation by a YWCA staff member for anxiety and depression. (Tr. 335). She was pregnant with her fourth child. (Tr. 341). She stopped working as a transportation aide after she was unable to provide daycare once this child was born. (Tr. 353). She worked at a McDonalds from February to August of 2009. (Tr. 261-68).

Plaintiff treated at Edgewater Psychiatric Outpatient Center from June of 2009 to June of 2010. (Tr. 345-46). Initial evaluation in June of 2009 indicated:

> Laura has been depressed, off and on, for "several years." She describes her depression to be sticking to herself. She tends to have

more anxiety attacks. She feels sad, her energy "sucks" and motivation "sucks, too." She sleeps some nights and other times she "tosses and turns." She has lost interest in lot of things such as crocheting, going out to the movies and hanging out with her friends. She feels hopeless because "I am not doing what I am supposed to be doing, I am not getting anywhere." She sometime feels suicidal, but has no definitive plans. She feels tired all the time. She denies any hallucinatory experiences and delusions. Her anxiety often times affects her driving and gets overwhelmed and confused.

(Tr. 353). Examination indicated blunted affect, but normal thoughts, intact memory, and she could perform abstractions. (Tr. 354). She was diagnosed with moderate depression with anxiety and assessed a global assessment of functioning ("GAF") of 55. (Tr. 355). She was prescribed Buspar, Paxil, and Ambien. (Tr. 355). In July of 2009, Plaintiff reported at follow-up that she had stopped going to work. (Tr. 352). Celexa was substituted for Paxil and she was instructed to get an earlier appointment for counseling. (Tr. 352). In August of 2009, Plaintiff reported feeling "empty in [her] head." (Tr. 351). Examination indicated depressed mood and blunted affect. (Tr. 351). In December of 2009, she reported that she had stopped working because she could not concentrate. (Tr. 349).

She returned to work at McDonalds from January to May of 2010. (Tr. 261-68, 348). She had been ordered to pay child support, and was keeping up with her payments. (Tr. 348). She indicated that Ambien was ineffective for sleep, so she was switched to a different sleep medication and Effexor. (Tr. 348).

In May of 2010, Plaintiff began reporting dizziness episodes. (Tr. 314). She was pregnant with her fifth child. (Tr. 413). Plaintiff had begun taking psychotropic medications for anxiety and depression over the previous six months. (Tr. 314). On May 12, 2010, MRI of the brain indicated congenital problems. (Tr. 327). She filed a previous claim for benefits under the Act at that time. (Tr. 112). A neurologist opined on May 28, 2010 that her congenital brain abnormalities should not "ever present a problem to this patient." (Tr. 327). In June of 2010, her psychiatrist indicated that Plaintiff was depressive, angry, hostile, labile, irritated and frustrated. (Tr. 347). She was upset with "the system." (Tr. 347). Her speech and thoughts were "rambling." (Tr. 347). Her psychiatrist indicated that Plaintiff had not yet been disabled for twelve months, as she had only been unable to work since April, but opined that she was eligible for six months of disability coverage. (Tr. 347).

Plaintiff received counseling at Alternative Consulting Enterprises from June to November of 2010. (Tr. 421). She reported forgetfulness and not handling stress well. (Tr. 424). She reported constantly hearing "evil clowns" who tormented her. (Tr. 424). She was initially diagnosed with recurrent depression and personality disorder, not otherwise specified, with a GAF of 45. (Tr. 430). She was discharged when her phone was disconnected and they could not reach her. (Tr. 420). Her diagnoses on discharge were recurrent depression and borderline

personality disorder, with a GAF of 45. (Tr. 420-22). In October of 2010, Plaintiff's initial application for benefits was denied by the state agency. (Tr. 347).

In December 2010, state agency psychologist David O'Connell, Ph.D., performed a consultative examination. (Tr. 377). He noted that she "had an Individual Educational Plan from first grade to 12th grade." (Tr. 378). Examination indicated:

> Affect is appropriate to ideation with a constricted range and moderately blunted in expression. Her mood is one of profound depression and moderate anxiety. She was confused as to how to get into the building going to a door that is not used regularly by either employees or patients. She states she becomes very confused in new or novel situations. Intelligence is judged to be in the borderline to low average range. She has a very poor fund of knowledge. She could not, for example, name how many weeks there are in a year.

> She has poor abstraction abilities, for example, she could not interpret any proverbs including "You can't judge a book by its cover," "Don't count your chickens before they are hatched," and "Strike while the iron is hot." She could not do times table….She states that she often becomes sidetracked and confused when she has to do tasks at home. Comprehension is poor, for example, she could not come up with an answer, why a house made of stone is better than one made of wood or why we need to cook certain foods before we eat them, or why a doctor's prescription is necessary for certain drugs…She appears to be highly distractible, has problems with focusing, problems with attention. There appears to be undiagnosed ADHD with her and she has a history of learning problems….She showed moderate psychomotor slowness. She appeared to show compromised with remote memory.

(Tr. 378-79).

He diagnosed her with generalized anxiety disorder, major depressive disorder continuous without psychotic features, mood disorder, not otherwise specified, attention deficit hyperactivity disorder, cognitive disorder, not otherwise specified, and learning disorder, not otherwise specified, with a global assessment of functioning ("GAF") of 29 (Tr. 379-80). He opined that she "needs assistance" with activities of daily living, and "frequently becomes confused." (Tr. 380). He opined she was "anxious, preoccupied, highly distractible, shows poor organizational skills, poor executive skills." (Tr. 380). He opined that she had "extreme" limitations in handling detailed instructions, making judgments on simple work-related decisions, and responding appropriately to work pressures and changes in a usual, routine work setting. (Tr. 373).

On December 20, 2010, Plaintiff presented to Dr. Elaine Douglas, M.D, at the Holy Spirit Hospital Behavioral Health Center. (Tr. 410). She had been "off [her] meds for six months due to [her] pregnancy and [was] not doing well." (Tr. 413). Plaintiff's symptoms included:

> [C]hronic suicidal ideations (but no intent or plan at present), somewhat decreased interest in pleasurable activities, poor energy, poor concentration, poor appetite with weight loss during this pregnancy, anxious and irritable feelings and frank panic attacks at times, and audible hallucinations. The patient states she feels the presence of "evil clowns" around her. She states these clowns verbally taunt her, calling her names and degrading her. At her worst moments, they will urge her to hurt someone who the patient is angry with.

(Tr. 413). Plaintiff's mother had custody of her three older children, and Plaintiff was in arrears in child support owed to her mother. (Tr. 414). Plaintiff reported that a judge had ordered her to undergo a tubal ligation to regain custody of her children, although Dr. Douglas "informed [her] that no one could order her to surgically alter her body." (Tr. 414). Plaintiff indicated she "continue[d] to have problems with math and reading comprehension, which limits her. She often finds it difficult to do jobs that demand her to produce things in a timely fashion or multitask. She also believe[d] she has concentration problems and attentional issues." (Tr. 414). Plaintiff reported that she had quit her job at McDonalds because she "could not handle the job duties." (Tr. 414). Examination indicated "her thoughts were somewhat scattered and her history was tangential and hard to follow… appeared anxious at times…Insight and judgment seem[ed] very impaired. Intelligence appeared below average." (Tr. 415). Dr. Douglas observed that Plaintiff had "a history of poor decision making and continued unplanned pregnancies who may, in fact, not be able to provide adequate care for her remaining child and to be born baby. She may, in fact, be a good candidate for disability given her learning problems and, at some point, neuropsychological testing would be of benefit." (Tr. 415). Dr. Douglas noted she was "at high risk for being homeless." (Tr. 415). Dr. Douglas diagnosed mood disorder, psychotic disorder, learning disorder, partner relational problem, and personality disorder and

assessed a GAF of 45 to 58. (Tr. 415). Dr. Douglas "complete[d] a form vouching that the patient is unable to work currently for the domestic relations court" and "encourage[d] her to reapply for Social Security Disability and to look into a lawyer to help with this." (Tr. 416). Dr. Douglas opined that Plaintiff's prognosis was "poor" and prescribed Seroquel. (Tr. 416).

On January 10, 2011, Plaintiff followed-up with Dr. Douglas. (Tr. 409). She indicated that Seroquel had helped decrease her hallucinations and initiate sleep. (Tr. 209). She was living with her mother. (Tr. 409). Plaintiff's affect was restricted, her mood was anxious, depressed, angry, and irritable, and her immediate memory was impaired. (Tr. 409). She reported sleeping for only three hours, with more anxiety, numb mood, and increased agitation with noise and light. (Tr. 409). Dr. Douglas updated Plaintiff's diagnoses to include bipolar disorder and opined that she was eligible for permanent disability. (Tr. 409). Plaintiff cancelled her January 31, 2011 appointment because she had her baby. (Tr. 408). On February 14, 2011, Plaintiff reported that "they wanted to put [her] in the [psychiatric] ward" after her delivery, but she refused because she needed to care for her two-year old child. (Tr. 407). Plaintiff's mood was anxious, depressed, and irritable and she reported continued auditory hallucinations. (Tr. 407). Her medications were changed to trileptal and Celexa. (Tr. 407).

On March 1, 2011, Plaintiff reported she could not "handle the situation [she was] in." (Tr. 406). She was screaming and yelling at her children and fighting with her mother. (Tr. 406). Her two year old child was "out of control" and her oldest son was in mobile therapy. (Tr. 406). Plaintiff reported passive suicidal thoughts. (Tr. 406). Her affect was restricted and her mood was depressed, angry, and irritable. (Tr. 406). She reported having auditory hallucinations "all the time." (Tr. 406). Plaintiff's medications were increased and she was referred to intensive outpatient therapy. (Tr. 406).

On March 29, 2011, Plaintiff reported that she could not begin intensive outpatient therapy because it was not covered by her insurance. (Tr. 405). She reported panic attacks, anxiety, and feeling like someone was "watching her." (Tr. 405). Plaintiff's affect was restricted, and her mood was angry and irritable. (Tr. 405). Her medications were increased. (Tr. 405).

On April 26, 2011, Plaintiff reported feeling "more calm" with the increase of medication. (Tr. 404). She continued to report hallucinations and feeling like bugs were crawling on her. (Tr. 404). Her mood was anxious, but better, and irritable and her affect was restricted. (Tr. 404). Dr. Douglas noted delusions. (Tr. 404). Plaintiff had begun the process for applying for benefits under the Act. (Tr. 404). On June 7, 2011, Plaintiff was irritable and tired with restricted affect, but

was calmer and reported less anger and hallucinations. (Tr. 403). Her medications included trazodone, Risperdal, trileptal, and Celexa. (Tr. 403).

On July 15, 2011, Dr. Mark Hite, Ed.D., reviewed Plaintiff's file and authored a medical opinion. (Tr. 125). He opined Plaintiff had a mild restriction in activities of daily living and moderate limitations in maintaining social functioning, concentration, persistence, and pace. (Tr. 124). Dr. Hite concluded that the records showed she "responded fairly well to treatment." (Tr. 124). He indicated that Plaintiff's memory and concentration were normal on examination. (Tr. 124). He indicated that her hallucinations were "adequately controlled" with medication. (Tr. 124). He opined she was "capable of understanding and remembering simple instructions and can carry them out." (Tr. 126). He opined that she was "not significantly limited" in maintaining attention and concentration for extended periods, performing activities within a schedule, maintaining regular attendance, being punctual within ordinary tolerances, sustaining an ordinary routine without special supervision, work in coordination with or in proximity to others without being distracted by them, making simple work-related decisions, completing a normal workday and workweek without interruptions from psychologically based symptoms, performing at a consistent pace without an unreasonable number and length of rest periods, asking simple questions, requesting assistance, accepting instructions and responding appropriately to

criticism from supervisors, maintaining socially appropriate behavior, traveling in unfamiliar places, using public transporting, setting realistic goals, and making plans independently of others. (Tr. 126-27). Dr. Hite wrote that there were "no" other medical opinions in the record. (Tr. 127).

Plaintiff continued treating with Dr. Douglas through January of 2013, when the ALJ issued the decision denying benefits. (Tr. 465). In July of 2011, she had restricted affect with anxious and irritable mood. (Tr. 465). Plaintiff reported increased anxiety, irritability, and "voices." (Tr. 465). Plaintiff reported continued "voices" and displayed restricted affect with depressed and angry mood in August and October of 2011. (Tr. 464). Her Celexa was increased and she began a trial of lithium. (Tr. 463).

In January of 2012, Plaintiff reported increased anxiety and appeared angry. (Tr. 462). Her lithium was increased. (Tr. 462). Through 2012, Plaintiff was "noncompliant at times," but was "better" with compliance by January of 2013. (Tr. 458). She reported less visual hallucinations and less anger on an increased dose of lithium. (Tr. 458).

On August 29, 2011, Dr. Douglas authored a letter that states:

> This letter is to verify that, in my clinical opinion, Ms. Laura Treadway is currently unable to work outside the home due to disability. In fact, it is doubtful that she will be able to maintain any meaningful sustainable employment in the future.

I have been treating Ms. Treadway for a number of psychiatric issues since December 2010. Her diagnoses include Schizoaffective Disorder, Bipolar Type; Learning Disorder NOS (including math, reading and association deficits); and Personality Disorder NOS. Ms. Treadway also has a congenital hypoplastic left frontal lobe of the brain.

Currently I am trying to better control symptoms of anger, mood reactivity and psychosis through medication adjustments. Complicating issues include continued familial tensions and stress, her post-partum status, limited finances and poor social supports.

I support Ms. Treadway's disability application based on chronic psychiatric illness coupled with cognitive deficits. You may wish to have Ms. Treadway undergo neuropsychological testing to better quantify her comorbid limitations, if you have not yet recommended this. Because of Ms. Treadway's deficits in functioning, she has lost custody of several of her children. Even if we manage to better stabilize the psychiatric symptoms, cognitive limitations would still render Ms. Treadway unemployable.

(Tr. 442).

On January 1, 2013, Dr. Douglas authored another medical opinion. (Tr. 442-450). She opined that Plaintiff would be absent more than three times per month and could only manage benefits with her mother's help. (Tr. 450). She opined that Plaintiff had a "low IQ or reduced intellectual functioning." (Tr. 449). She noted that Plaintiff was prescribed lithium, cogentin, trazodone, and Prozac. (Tr. 448). She opined that Plaintiff was markedly limited in traveling to unfamiliar places, using public transportation, setting realistic goals or making plans independently, maintaining attention and concentration for extended periods, performing activities within a schedule, maintaining regular attendance, being

punctual within ordinary tolerances, sustaining an ordinary routine without special supervision, working in coordination with or in proximity to others without being distracted by them, completing a normal workday and workweek without interruptions from psychologically based symptoms, interacting with the general public, performing at a consistent pace without an unreasonable number and length of rest periods, accepting instructions and responding appropriately to criticism from supervisors, getting along with co-workers or peers without distracting them or exhibiting behavioral extremes, and responding appropriately to changes in the work setting. (Tr. 447-48).

Dr. Douglas explained that Plaintiff's "agitation [and] anger quickly explode" when she was "under stress" and had "periodic mood swings [consistent with] her diagnosis." (Tr. 448). She indicated that Plaintiff's primary symptoms were mood lability, aggressiveness, poor insight, and poor judgment. (Tr. 445). Her GAF ranged from 45 to 48. (Tr. 443). She noted that Plaintiff's prognosis was limited due to "chronic mental illness and cognitive deficits that are not curable." (Tr. 443). She identified clinical findings of poor memory, sleep disturbance, mood disturbance, emotional lability, delusions or hallucinations, psychomotor agitation, paranoia or inappropriate suspiciousness, feelings of guilt or worthlessness, difficulty thinking or concentrating, social withdrawal or isolation, decreased energy, manic syndrome, hostility and irritability. (Tr. 444).

On January 15, 2013, Plaintiff appeared and testified at a hearing before an ALJ. (Tr. 108). She was living in a mobile home with her mother and her five children. (Tr. 69). Her mother had custody of her three older children, and received child support from their father and benefits under the Act. (Tr. 69). Her mother also received benefits under the Act for one of Plaintiff's sons due to mood disorders, ADHD, and oppositional defiant disorder. (Tr. 69). Plaintiff received child support for one younger child, food stamps, and a medical Access card. (Tr. 71).

On January 25, 2013, the ALJ issued the decision. (Tr. 52). At step one, the ALJ found that Plaintiff had not engaged in substantial gainful activity since January 10, 2011, the alleged onset date. (Tr. 45). At step two, the ALJ found that Plaintiff's learning disorder, schizo affective disorder, bipolar type, and personality disorder were medically determinable and severe. (Tr. 45). At step three, the ALJ found that Plaintiff did not meet or equal a Listing. (Tr. 46). The ALJ found that Plaintiff had the RFC to:

> [P]erform a full range of work at all exertional levels. However, the claimant requires simple instructions and cannot perform tasks involving production or pace work, and is limited to jobs with occasional decision making and judgments. The claimant can sustain only occasional work setting changes with respect to simple instructions, requires jobs with a GED of 1-2 in reasoning, math and language with a grade equivalence of 1-6.

(Tr. 47). A step four, the ALJ found that Plaintiff could not perform past relevant work. (Tr. 51). At step five, the ALJ found that Plaintiff could perform work in the national economy. (Tr. 51). Consequently, the ALJ found that Plaintiff was not disabled and not entitled to benefits. (Tr. 52).

## V.    Plaintiff Allegations of Error

Plaintiff asserts that the ALJ erred in failing to address Dr. O'Connell's opinion. (Pl. Brief at 20-22). Dr. O'Connell's opinion supports treating source Dr. Douglas's opinion. (Pl. Brief at 20-22). Defendant responds with post-hoc rationalizations that this opinion was not probative. (Def. Brief at 14-15). Defendant asserts that, although the ALJ did not explicitly mention Dr. O'Connell's opinion, it was considered by the ALJ. (Def. Brief at 16).

In *Burnett,* the Third Circuit rejected an argument similar to Defendant's argument here:

> Similar to the medical reports, the ALJ must also consider and weigh all of the non-medical evidence before him. *See Van Horn v. Schweiker,* 717 F.2d 871, 873 (3d Cir.1983); *Cotter,* 642 F.2d at 707. Although allegations of pain and other subjective symptoms must be consistent with objective medical evidence, *see Hartranft,* 181 F.3d at 362 (citing 20 C.F.R. § 404.1529), the ALJ must still explain why he is rejecting the testimony. *See Van Horn,* 717 F.2d at 873. In *Van Horn,* this Court set aside an ALJ's finding because he failed to explain why he rejected certain non-medical testimony. *See* 717 F.2d at 873. In this case, the ALJ explained he rejected Burnett's testimony regarding the extent of her pain because he determined it was not supported by the objective medical evidence. However, the ALJ failed to mention the testimony of Burnett's husband, George Burnett, and her neighbor, Earl Sherman. On appeal, the Commissioner contends

the ALJ did not need to mention their testimony because it "added nothing more than stating [Burnett's] testimony was truthful." Commissioner's Brief at 21. This argument lacks merit because the ALJ made a credibility determination regarding Burnett, and these witnesses were there to bolster her credibility. R. 17 ("claimant's allegations of disability made at hearing are unsubstantiated"). In *Van Horn,* we stated we expect the ALJ to address the testimony of such additional witnesses. On remand, the ALJ must address the testimony of George Burnett and Earl Sherman.

*Burnett v. Comm'r of Soc. Sec. Admin.,* 220 F.3d 112, 122 (3d Cir. 2000).

Admittedly, "[i]n some circumstances, a piece of evidence can be so lacking in probative value, or so overwhelmed by countervailing evidence, that it can be implicitly rejected without explanation." *McConnell v. Astrue*, CIV.A. 3:09-44, 2010 WL 2925053, at *9 (W.D. Pa. July 20, 2010) (citing *Johnson v. Comm'r of Soc. Sec.,* 529 F.3d 198, 203–205 (3d Cir.2008)). Here, however, Dr. O'Connell's opinion is corroborated by treating source Dr. Douglas's opinion, and is not overwhelmed by countervailing evidence. *Supra.*

*Burnett* plainly states that the Third Circuit "expect[s] the ALJ to address the testimony of such additional witnesses." *Id.* at 122. The ALJ did not address Dr. O'Connell's opinion which, as discussed above, was probative evidence that was not overwhelmed by countervailing evidence. Consequently, the ALJ's failure to address this opinion precludes meaningful review of his credibility assessment and his assignment of weight to Dr. Douglas. *See Diaz v. Comm'r of Soc. Sec.*, 577 F.3d 500, 504-05 (3d Cir. 2009) ("The ALJ must provide a 'discussion of the

evidence' and an 'explanation of reasoning' for his conclusion sufficient to enable meaningful judicial review") (quoting *Burnett v. Comm'r of Soc. Sec. Admin.*, 220 F.3d 112, 120 (3d Cir. 2000); *Liszka v. Colvin*, CIV.A. 3:14-0280, 2015 WL 3771238, at *3-4 (M.D. Pa. June 17, 2015) (Overruling Defendant's objections that Report and Recommendation to remand was based on an "overly broad application of *Burnett*," noting that "[t]he language of *Burnett* is broad") (citing *Frank–Digovanni v. Colvin,* 2014 WL 2177090 (M.D.Pa. May 22, 2014) (Remanding where ALJ did not consider the statement of plaintiff's husband)); *see also Maellaro v. Colvin*, 3:12-CV-01560, 2014 WL 2770717, at *12 (M.D. Pa. June 18, 2014) ("The Commissioner encourages claimants to submit third party statements, and recognizes the relevance of statements from individuals who know the claimant. *See* 20 C.F.R. §§ 416.912, 416.913 and 416.929; SSR 96–7p and 96–8p. Third party statements can support a claimant's credibility, and help evaluate the claimant's impairments, symptoms, limitations, functioning, and activities of daily living. *Id.; see also, Burnett,* 220 F.3d at 122.").

As the Third Circuit has explained:

> [T]he Secretary must "explicitly" weigh all relevant, probative and available evidence. *Dobrowolsky v. Califano,* 606 F.2d 403, 407 (3d Cir.1979); *see also Brewster v. Heckler,* 786 F.2d 581, 584 (3d Cir.1986); *Cotter,* 642 F.2d at 705. The Secretary must provide some explanation for a rejection of probative evidence which would suggest a contrary disposition. *Brewster,* 786 F.2d at 585. The Secretary may properly accept some parts of the medical evidence and reject other parts, but she must consider all the evidence and give some reason for

discounting the evidence she rejects. *Stewart v. Secretary of H.E.W.,*
714 F.2d 287, 290 (3d Cir.1983)

*Adorno v. Shalala*, 40 F.3d 43, 48 (3d Cir. 1994). Consequently, the Court

recommends remand for the ALJ to appropriately assess Dr. O'Connell's opinion.

As the Third Circuit explained in *Ventura v. Shalala*, 55 F.3d 900 (3d Cir.

1995):

> ALJs have a duty to develop a full and fair record in social security
> cases. *See Brown v. Shalala,* 44 F.3d 931, 934 (11th Cir.1995); *Smith
> v. Harris,* 644 F.2d 985, 989 (3d Cir.1981). Accordingly, an ALJ must
> secure relevant information regarding a claimant's entitlement to
> social security benefits. *Hess,* 497 F.2d at 841. In *Hess* we reasoned
> that "[a]lthough the burden is upon the claimant to prove his
> disability, due regard for the beneficent purposes of the legislation
> requires that a more tolerant standard be used in this administrative
> proceeding than is applicable in a typical suit in a court of record
> where the adversary system prevails." *Id.* at 840.

*Id.* at 902. "It is the ALJ's duty to investigate the facts and develop the arguments

both for and against granting benefits." *Sims v. Apfel,* 530 U.S. 103, 111, 120 S.Ct.

2080, 147 L.Ed.2d 80 (2000). Under the Regulations, 20 C.F.R. 404.1527(c) states

that the ALJ "will evaluate every medical opinion we receive." *Id*.

Medical evidence that is not from a relevant period can still be probative of

disability during the relevant period. In fact, the Regulations and case law require

the ALJ to consider non-contemporaneous evidence. For instance, the Regulations

require the ALJ to evaluate the medical records for at least twelve months prior to

an application for SSI, even though benefits for SSI may not be awarded until the

month after the application. 20 C.F.R. § 416.912(d) ("Before we make a determination that you are not disabled, we will develop your complete medical history for at least the 12 months preceding the month in which you file your application unless there is a reason to believe that development of an earlier period is necessary or unless you say that your disability began less than 12 months before you filed your application."); *see also* 20 C.F.R. § 404.1512(d). There is no exception to this requirement in the Regulations for cases with a previously adjudicated claim within twelve months.

Similarly, SSR 83-20 requires the ALJ to consider non-contemporaneous evidence when a claimant alleges disability due to a slowly progressing disease with an onset prior to the earliest available evidence. SSR 83-20; *Newell v. Comm. of Social Security*, 347 F.3d 541, 547 (3d Cir. 2003) ("[E]ven non-contemporaneous records of Newell's liver disease, diabetes, and neuropathy are relevant to the determination of whether their onset occurred by the date Newell alleges. Here, the ALJ failed properly to consider the non-contemporaneous evidence presented by Newell in order to perform a retrospective analysis.") (citing *Ivy v. Sullivan,* 898 F.2d 1045, 1049 (5th Cir.1990)). Non-contemporaneous evidence also assists an ALJ understand the course of a claimant's impairments. SSR 96-7p ("Apart from the medical signs and laboratory findings, the medical evidence, especially a longitudinal medical record, can be extremely valuable in

the adjudicator's evaluation of an individual's statements about pain or other symptoms. Important information about symptoms recorded by medical sources and reported in the medical evidence may include…course over time (e.g., whether worsening, improving, or static)").

The ALJ's reliance on Dr. Hite's opinion does not cure this omission. Dr. Hite made several factual errors. Dr. Hite ignored Dr. Douglas's opinion that Plaintiff was permanently disabled and Dr. O'Connell's opinion, indicating instead that no medical opinions were in the file. (Tr. 124-27). Dr. Hite erroneously stated that Plaintiff's mental status examinations indicated normal attention and concentration; Dr. Douglas's form does not specifically address attention or concentration, and Dr. O'Connell observed significant attention and concentration deficits. (Tr. 124-27, 470). Dr. Hite indicated that Plaintiff could travel to unfamiliar places, without noting Dr. O'Connell's observation that Plaintiff struggled with traveling to unfamiliar places. (Tr. 124-27). Dr. Hite opined that Plaintiff's hallucinations were "adequately controlled" although she reported continued auditory hallucinations that decreased, but did not resolve, with medication. (Tr. 124-27). Moreover, a finding that symptoms are controlled is not inconsistent with a finding of disability. *See Morales v. Apfel*, 225 F.3d 310, 319 (3d Cir. 2000) ("Dr. Erro's observations that Morales is 'stable and well controlled

with medication' during treatment does not support the medical conclusion that Morales can return to work.").

Thus, Dr. Hite's opinion also does not provide substantial evidence to reject Dr. Douglas's opinion. *See id.* at 316-17 ("[D]etermination of the existence *vel non* of substantial evidence is not merely a quantitative exercise. A single piece of evidence will not satisfy the substantiality test if the [Commissioner] ignores, or fails to resolve, a conflict created by counterveiling evidence. Nor is evidence substantial if it is overwhelmed by other evidence—particularly certain types of evidence (e.g., that offered by treating physicians)") (internal citations omitted).

The Court remands for the ALJ to properly evaluate the medical opinions. Because the Court remands on these grounds, it declines to address Plaintiff's other allegations of error. A remand may produce different results on these claims, making discussion of them moot. *See LaSalle v. Comm'r of Soc. Sec.*, No. CIV.A. 10-1096, 2011 WL 1456166, at *7 (W.D. Pa. Apr. 14, 2011).

## VII.    Conclusion

The Court finds that the ALJ's decision lacks substantial evidence because the ALJ failed to properly evaluate the vocational evidence. Pursuant to 42 U.S.C. § 405(g), the decision of the Commissioner is vacated, and this case is remanded for further proceedings.

An appropriate Order in accordance with this Memorandum will follow.

Dated: October 7, 2015 _____ *s/Gerald B. Cohn*_____
GERALD B. COHN
UNITED STATES MAGISTRATE JUDGE